**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| BRYAN HENRY and JAMES CLIFFORD, *individually and on behalf of themselves and all others similarly situated*,<br><br>Plaintiffs,<br><br>v.<br><br>MAJOR LEAGUE BASEBALL ADVANCED MEDIA, L.P.,<br><br>Defendant. | Case No. 1:24-cv-01446-GHW-GWG<br><br>**CLASS ACTION**<br><br>**JURY TRIAL DEMANDED** |

**AMENDED CLASS ACTION COMPLAINT**

Plaintiffs Bryan Henry and James Clifford, on behalf of themselves and all others similarly situated, file this Complaint against Defendant Major Lague Baseball Advanced Media, L.P. ("MLB" or "Defendant") for violation of the federal Video Privacy Protection Act, 18 U.S.C. § 2710 ("VPPA"), through its website, *MLB.com*, and its video streaming service, *MLB.tv.* Plaintiffs' allegations are made on personal knowledge as to Plaintiffs and Plaintiffs' own acts and upon information and belief as to all other matters.

## I. NATURE OF THE ACTION

1. This is a consumer digital privacy class action complaint against MLB, as the owner of *MLB.com* and *MLB.tv*, for its practice that violates VPPA by

knowingly disclosing to a third party, Meta Platforms, Inc. ("Facebook"), data containing its digital subscribers' (i) personally identifiable information or Facebook ID ("FID") and (ii) the computer file containing the prerecorded video, its name or title, and its corresponding URL viewed ("Video Media") (collectively, "Personal Viewing Information") without obtaining proper consent.

2. VPPA prohibits "video tape service providers," such as *MLB.com* and *MLB.tv*, from knowingly disclosing consumers' "personally identifiable information," which "includes information which identifies a person as having requested or obtained specific video materials or services from a video tape provider," without first obtaining express consent in a stand-alone consent form. U.S.C. § 2710(a)(3), (b).

3. Like other businesses with an online presence, Defendant collects and shares the personal information of visitors to its website and mobile application ("App") with third parties. Defendant does this through cookies, software development kits ("SDK"), and pixels. In other words, digital subscribers to *MLB.com* and *MLB.tv* have their personal information disclosed to Defendant's third-party business partners.

4. The Facebook pixel is a code Defendant installed on its *MLB.com* and *MLB.tv* website allowing it to collect users' data. More specifically, it tracks when digital subscribers enter the *MLB.com* and *MLB.tv* website or App and view Video

Media. Defendant's websites track and disclose to Facebook the digital subscribers' viewed Video Media, and most notably, the digital subscribers' FID. This occurs even when the digital subscriber has not shared (nor consented to share) such information.

5. Importantly, Defendant shares the Personal Viewing Information—i.e., digital subscribers' unique FID and Video Media viewed—*together as one data point to Facebook*. Because the digital subscriber's FID uniquely identifies an individual's Facebook user account (containing, among other things, their real name, photograph, and other personally identifying information), Facebook—or any other ordinary person—can use it to quickly and easily locate, access, and view digital subscribers' corresponding Facebook profile. Put simply, Facebook pixel grants Facebook knowledge of the Video Media each of its subscribers view on the *MLB.com* and *MLB.tv* site.

6. Defendant uses the Personal Viewing Information to build more targeted advertising on its website which, in turn, generates greater revenue. Thus, without obtaining consent from its digital subscribers, Defendant profits from its unauthorized disclosure of its digital subscribers' Personal Viewing Information to Facebook. Defendant reaps these secret profits at the expense of its digital subscribers' privacy and their statutory rights under VPPA.

7. Because Defendant does not inform *MLB.com* and *MLB.tv* digital subscribers about this dissemination of their Personal Viewing Information—indeed, it is automatic and *invisible*—they cannot exercise reasonable judgment to defend themselves against the highly personal ways *MLB.com* and *MLB.tv* has used and continues to make money by using their personal data.

8. Defendant chose to disregard Plaintiffs' and hundreds of thousands of other *MLB.com* and *MLB.tv* digital subscribers' statutorily protected privacy rights by releasing their sensitive personal data to Facebook. Accordingly, Plaintiffs bring this class action for legal and equitable remedies to redress and put a stop to Defendant's practices of intentionally disclosing its digital subscribers' Personal Viewing Information to Facebook in knowing violation of VPPA.

## II. JURISDICTION AND VENUE

9. This Court has subject matter jurisdiction under 28 U.S.C. § 1331 over the claims that arise under the Video Privacy Protection Act, 18 U.S.C. § 2710.

10. This Court also has jurisdiction under 28 U.S.C. § 1332(d) because this action is a class action in which the aggregate amount in controversy for the proposed Class (defined below) exceeds $5,000,000, and at least one member of the Class is a citizen of a state different from that of Defendant.

11. Venue is appropriate in this District pursuant to 28 U.S.C. §1391 because Defendant does business in and is subject to personal jurisdiction in this

District. Venue is also proper in this District because the *MLB.tv* Terms of Use states that, as to Plaintiffs' VPPA claims, the exclusive jurisdiction is "the federal and state courts in New York County, New York…."

**III. PARTIES**

12. Plaintiff Bryan Henry is an adult citizen of California and is domiciled in Redondo Beach, California. Plaintiff Henry began his digital subscription to *MLB.tv* thoughts the 2023 T-Mobile Tuesdays Promotion and continues to maintain the subscription to this day. Henry became a paid subscriber to *MLB.tv* beginning on or around 2023 which granted him exclusive access to view prerecorded video and media content on Defendant's website and app without advertisements.

13. Plaintiff Henry has had a Facebook account throughout the period he has been an *MLB.tv* digital subscribers. During the relevant time period he has used his *MLB.tv* digital subscription to view Video Media through the *MLB.tv* website and/or App while logged into his Facebook account, including prerecorded videos. By doing so, Plaintiff Henry's Personal Viewing Information was disclosed to Facebook pursuant to the systematic process described herein. Because of this disclosure, Facebook was able to link Plaintiff Henry's identity, including his real name and other personally identifying information on his Facebook page, to the prerecorded videos he watched on *MLBtv*. Plaintiff Henry never gave Defendant express written consent to disclose his Personal Viewing Information.

14. Plaintiff James Clifford is an adult citizen of Pennsylvania and is domiciled in Pottsville, PA. Plaintiff Clifford began his digital subscription to *MLB.com* by signing up on his cell phone and creating an MLB.com account prior to 2021 and maintains his subscription to this day. Plaintiff Clifford watched prerecorded videos such as recaps of games and game highlights and does not recall ever watching any live videos on MLB.com.

15. Plaintiff Clifford has had a Facebook account throughout the period he has been an *MLB.com* digital subscriber. During the relevant time period he has used his *MLB.com* digital subscription to view Video Media through the *MLB.com* website and/or App while logged into his Facebook account. By doing so, Plaintiff Clifford's Personal Viewing Information was disclosed to Facebook pursuant to the systematic process described herein. Because of this disclosure, Facebook was able to link Plaintiff Clifford's identity, including his real name and other personally identifying information on his Facebook page, to the prerecorded videos he watched on *MLBtv*. Plaintiff Clifford never gave Defendant express written consent to disclose his Personal Viewing Information.

16. Defendant is a limited partnership of the club owners of Major League Baseball headquartered in New York, New York. Defendant develops, owns, and operates the *MLB.tv* and *MLB.com* websites, which include a broad selection of

prerecorded video content posted along with their stories and other digital media content.

## IV. FACTUAL ALLEGATIONS

### A. Background of the Video Privacy Protection Act

17. VPPA generally prohibits the knowing disclosure of a customer's video rental or sale records without the informed, written consent of the customer in a form "distinct and separate from any form setting forth other legal or financial obligations." 18 U.S.C. § 2710(b)(2)(B)(i). Under the statute, the Court may award actual damages (but not less than liquidated damages of $2,500.00 per person), punitive damages, equitable relief and attorney's fees. *Id.* at § 2710(c).

18. VPPA was initially passed in 1988 to protect the privacy of individuals' and their families' video rental, purchase and viewing data. Prior to its enactment, members of the United States Senate warned that "[e]very day Americans are forced to provide to businesses and others personal information without having any control over where that information goes." S. Rep. No. 100-599 at 7-8 (1988).

19. Senators at the time were particularly troubled by disclosures of records that reveal consumers' purchases and rentals of videos and other audiovisual materials. As Senator Patrick Leahy and the late Senator Paul Simon recognized, records of this nature offer "a window into our loves, likes, and dislikes," such that "the trail of information generated by every transaction that is now recorded and

stored in sophisticated record-keeping systems is a new, more subtle and pervasive form of surveillance." S. Rep. No. 100-599 at 7-8 (1988) (statements of Sens. Simon and Leahy, respectively).

20. In proposing the Video and Library Privacy Protection Act, later codified as VPPA, Senator Leahy stated that "[i]n practical terms our right to privacy protects the choice of movies that we watch with our family in our own homes. And it protects the selection of books that we choose to read." 134 Cong. Rec. S5399 (May 10, 1988). Thus, the personal nature of such information, and the need to protect it from disclosure, is the inspiration of the statute: "[t]hese activities are at the core of any definition of personhood. They reveal our likes and dislikes, our interests and our whims. They say a great deal about our dreams and ambitions, our fears and our hopes. They reflect our individuality, and they describe us as people." *Id*.

21. While these statements rang true in 1988 when VPPA was passed, the importance of legislation like VPPA in the modern era of data mining from online activities is even more pronounced. During a recent Senate Judiciary Committee meeting, "The Video Privacy Protection Act: Protecting Viewer Privacy in the 21st Century," Senator Leahy emphasized the point by stating: "While it is true that technology has changed over the years, we must stay faithful to our fundamental right to privacy and freedom. Today, social networking, video streaming, the

'cloud,' mobile apps and other new technologies have revolutionized the availability of Americans' information."[1]

22. In this case, Defendant chose to deprive Plaintiffs and the Class members of that right by systematically disclosing their Personal Viewing Information to Facebook, without providing notice to (let alone obtaining consent from) anyone, as explained herein.

### B. *MLB.com* and *MLB.tv*'s Digital Subscriptions

23. Defendant owns and operates a www.MLB.tv, a website that provides a wide range of professional baseball coverage through audio and prerecorded video clips, interviews, statistics, schedules and exclusive stories. It also offers an App available for download on Android and iPhone devices.

24. To register for *MLB.tv*, users like Plaintiff Henry provide their personal information, including but not limited to their email address and date of birth.

25. On information and belief, all *MLB.tv* subscribers like Plaintiff Henry provide Defendant with their IP address, which is a unique number assigned to all information technology connected devices, that informs Defendant as to subscribers' city, zip code and physical location.

---

[1] The Video Privacy Protection Act: Protecting Viewer Privacy in the 21st Century, Senate Judiciary Committee Subcommittee on Privacy, Technology and the Law, http://www.judiciary.senate.gov/meetings/the-video-privacy-protection-act-protecting-viewer-privacy-in-the21stcentury (last accessed March 15, 2022).

26. Subscribers to *MLB.tv* may provide to Defendant the identifier on their mobile devices and/or cookies stored on their devices.

27. When opening an *MLB.tv* account or subscribing to a newsletter, Defendant does not disclose to its subscribers that it will share their Personal Viewing Information with third parties, such as Facebook. Subscribers are also not asked to consent to such information sharing upon opening an account.

28. After becoming a *MLB.tv* subscriber, viewers have access to a variety of prerecorded Video Media on Defendant's digital platforms.

29. Defendant also offers digital subscribers a paid membership option on its *MLB.tv* website. Paid subscribers to *MLB.tv*, such as Plaintiff Henry, are granted exclusive access to view prerecorded video and media content on Defendant's website and app without advertisements.

30. Notably, once a digital subscriber like Plaintiff Henry signs in and watches *MLB.tv*'s Video Media, the digital subscriber is not provided with any notification that their Personal Viewing Information is being shared. Similarly, Defendant also fails to obtain digital subscribers' written consent to collect their Personal Viewing Information "in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer," as the VPPA requires.

31. Defendant also owns and operates www.MLB.com, a website that provides a wide range of professional baseball coverage through audio and

prerecorded video clips, interviews, statistics, schedules and exclusive stories. It also offers an App available for download on Android and iPhone devices.

32. To register for *MLB.com*, users such as Plaintiff Clifford provide their personal information, including but not limited to their email address and date of birth.

33. On information and belief, all *MLB.com* subscribers, including Plaintiff Clifford, provide Defendant with their IP address, which is a unique number assigned to all information technology connected devices, that informs Defendant as to subscribers' city, zip code and physical location.

34. Subscribers to MLB.com may provide to Defendant the identifier on their mobile devices and/or cookies stored on their devices.

35. When opening an *MLB.com* account, Defendant does not disclose to its subscribers that it will share their Personal Viewing Information with third parties, such as Facebook. Subscribers are also not asked to consent to such information sharing upon opening an account.

36. After becoming a subscriber to *MLB.com*, viewers have access to a variety of prerecorded Video Media on Defendant's digital platforms.

37. Notably, once a digital subscriber signs in and watches *MLB.com*'s Video Media, the digital subscriber is not provided with any notification that their Personal Viewing Information is being shared. Similarly, Defendant also fails to

obtain digital subscribers' written consent to collect their Personal Viewing Information "in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer," as the VPPA requires.

## C. How MLB.tv Disseminates Digital Subscribers' Personal Viewing Information

### 1. Tracking Pixels

38. Websites and apps use Facebook's pixel and SDK to collect information about user's devices and activities and send that to Facebook. Facebook then uses that information to show the user targeted ads.

39. The Facebook tracking pixel, also known as a "tag" or "web beacon" among other names, is an *invisible* tool that tracks consumers' actions on Facebook advertisers' websites and reports them to Facebook. It is a version of the social plugin that gets "rendered" with code from Facebook. To obtain the code for the pixel, the website advertiser tells Facebook which website events it wants to track (e.g., Video Media) and Facebook returns corresponding Facebook pixel code for the advertiser to incorporate into its website.

40. Defendant installed the Facebook tracking pixel, which enables it to disclose Plaintiffs' and Class Members' Personal Viewing Information to Facebook, because it benefits financially from the advertising and information services that stem from use of the pixel. The pixel allows Facebook to build detailed profiles

about a website's users as those users browse the Internet to enable advertisers to serve them with targeted advertisements.

41. When an *MLB.com* or *MLB.tv* digital subscriber enters the websites and watches Video Media on the website, the website sends to Facebook certain information about the viewer, including, but not limited to, their identity and the media content the digital subscriber watched. Specifically, *MLB.com* and *MLB.tv* sends to Facebook the video content name, its URL, and, most notably, the viewers' Facebook ID.

**2. Facebook ID ("FID")**

42. An FID is a unique and persistent identifier that Facebook assigns to each user. With it, anyone ordinary person can look up the user's Facebook profile and name.[2] When a Facebook user with one or more personally identifiable FID cookies on his or her browser views Video Media from *MLB.com* or *MLB.tv* on the website or app, *MLB.com* and *MLB.tv*, through their website code, causes the digital subscriber's identity and viewed Video Media to be transmitted to Facebook by the user's browser. This transmission is not the digital subscriber's decision, but results from Defendant's purposeful use of its Facebook tracking pixel by incorporation of that pixel and code into *MLB.com*'s and *MLB.tv*'s website or App.

[2] Facebook's Real Name Policy requires users to use their authentic name—the name they go by in daily life—on their profiles. The policy is intended to ensure users know who they are connecting with, promote accountability, and reduce anonymous abuse.

43. Defendant could easily program its websites and Apps to prevent its users' Personal Viewing Information from being automatically transmitted to Facebook when a subscriber views Video Media. However, it is not Defendant's financial interest to do so because it benefits financially by providing this highly sought-after information.

44. Notably, while Facebook can easily identify any individual on its Facebook platform with only their unique FID, so too can any ordinary person who comes into possession of an FID. Facebook admits as much on its website. Indeed, ordinary persons who come into possession of the FID can connect to any Facebook profile. Simply put, with only an FID and the video content name and URL—all of which Defendant knowingly and readily provides to Facebook without any consent from the digital subscribers—any ordinary person can learn the identity of the digital subscriber and the specific video or media content they requested on the *MLB.tv* website. In other words, by obtaining a person's FID, any third-party can discover exactly which videos that person watched on Defendant's websites, which is exactly the type of personally identifiable information that VPPA is intended to protect from unauthorized disclosure.

45. At all relevant times, Defendant knew that the Facebook pixel disclosed Personal Viewing Information to Facebook. This was evidenced from, among other things, the functionality of the pixel, including that it enabled *MLB.tv* and *MLB.com*

websites and Apps to show targeted advertising to its digital subscriber's based on the products those digital subscriber's had previously viewed on the websites or Apps, including Video Media purchases, for which Defendant received financial remuneration.

### D. *MLB.com* and *MLB.tv* Unlawfully Disclose Their Digital Subscribers' Personal Viewing Information to Facebook

46. Defendant maintains a vast digital database comprised of its digital subscribers' Personal Viewing Information, including the names and e-mail addresses of each digital subscriber and information reflecting the Video Media that each of its digital subscribers viewed.

47. Defendant is not sharing anonymized, non-personally identifiable data with Facebook, as it represents. To the contrary, the data it discloses is tied to unique identifiers that track specific Facebook users. Importantly, the recipient of the Personal Viewing Information—Facebook—*receives the Personal Viewing Information as one data point*. Defendant has thus monetized its database by disclosing its digital subscribers' Personal Viewing Information to Facebook in a manner allowing it to make a direct connection—without the consent of its digital subscribers and to the detriment of their legally protected privacy rights.

48. Critically, the Personal Viewing Information Defendant discloses to Facebook allows Facebook to build from scratch or cross-reference and add to the

data it already has in their own detailed profiles for its own users, adding to its trove of personally identifiable data.

49. As a result of Defendant's data compiling and sharing practices, Defendant has knowingly disclosed to Facebook for its own personal profit the Personal Viewing Information of Defendant's digital subscribers, together with additional sensitive personal information.

50. Defendant does not seek its digital subscribers' prior written consent to the disclosure of their Personal Viewing Information (in writing or otherwise) and its customers remain unaware that their Personal Viewing Information and other sensitive data is being disclosed to Facebook.

51. By disclosing its digital subscribers Personal Viewing Information to Facebook—which undeniably reveals their identity and the specific video materials they requested from Defendant's websites—Defendant has intentionally and knowingly violated VPPA.

### E. Defendant Does Not Need to Disclose Personal Viewing Information to Operate its Websites and Apps

52. Tracking pixels are not necessary for Defendant to operate *MLB.com*'s and *MLB.tv*'s digital publications and sign-up digital subscriptions. They are deployed on Defendant's websites and Apps for the sole purpose of enriching Defendant and Facebook.

53. Even if an on-line publication found it useful to integrate Facebook tracking pixels, Defendant is not required to disclose Personal Viewing Information to Facebook. In any event, if Defendant wanted to do so, it must first comply with the strict requirements of VPPA, which it failed to do. As noted above, even Facebook forbids the disclosure of such information without first complying specifically with VPPA (and relevant state laws).

**F. Plaintiffs' Experiences**

54. Plaintiff Bryan Henry has been a digital subscriber of *MLB.tv* from approximately 2023 to the present. Henry became a digital subscriber of *MLB.tv* by providing, among other information, his name, address, email address, IP address (which informs Defendant as to the city and zip code he resides in as well as his physical location), and any cookies associated with his device. As part of his subscription, he receives emails and other digital content from *MLB.tv*.

55. On or around 2023, Plaintiff Henry became a paid digital subscriber of *MLB.tv* by providing payment to Defendant and started his *MLB.tv* subscription, which granted him exclusive access to view prerecorded video and media content on Defendant's website and app without advertisements along with other exclusive benefits for paid subscribers.

56. Plaintiff Henry has had a Facebook account since before he signed up for *MLB.tv*. From 2023 to the present, Plaintiff Henry requested, obtained, and

viewed prerecorded Video Media via *MLB.tv*'s website and App, and through the use of the Pixel, Defendant knowingly transmitted his Personal Viewing Information concerning the prerecorded videos he watched to Facebook, allowing Facebook to connect Plaintiff Henry's identity to the specific prerecorded videos he watched on *MLB.tv*'s platform.

57. Plaintiff Henry never consented, agreed, authorized, or otherwise permitted Defendant to disclose his Personal Viewing Information to Facebook. Plaintiff Henry has never been provided any written notice that Defendant discloses its digital subscribers' Personal Viewing Information, or any means of opting out of such disclosures of his Personal Viewing Information. Defendant nonetheless knowingly disclosed Plaintiff Henry's Personal Viewing Information to Facebook.

58. Because Plaintiff Henry is entitled by law to privacy in his Personal Viewing Information, Defendant's disclosure of his Personal Viewing Information deprived Plaintiff Henry of the full set of benefits to which he was entitled as part of being a *MLB.tv* digital subscriber.

59. Plaintiff James Clifford has been a digital subscriber of *MLB.com* from approximately 2021 to the present. Plaintiff Clifford became a digital subscriber of *MLB.com* by providing, among other information, his name, email address, IP address (which informs Defendant as to the city and zip code he resides in as well

as his physical location), and any cookies associated with his device. As part of his subscription, he receives emails and other digital content from *MLB.com.*

60. Plaintiff Clifford became a subscriber of *MLB.com* by creating an MLB.com account which he uses to log in to the *MLB.com* website and App. In exchange, MLB.com grants Plaintiff Clifford access to view prerecorded video and media content on Defendant's *MLB.com* website and app.

61. Plaintiff Clifford has had a Facebook account since before he signed up for *MLB.com*. From at least 2021 to the present, Plaintiff Clifford requested, obtained, and viewed prerecorded Video Media via *MLB.com*'s website and App. Through the use of the Pixel, Defendant knowingly transmitted Plaintiff Clifford's Personal Viewing Information concerning the prerecorded videos he watched to Facebook, allowing Facebook to connect Plaintiff Clifford's identity to the specific prerecorded videos he watched on *MLB.tv*'s platform.

62. Plaintiff Clifford never consented, agreed, authorized, or otherwise permitted Defendant to disclose his Personal Viewing Information to Facebook. Plaintiff Clifford has never been provided any written notice that Defendant discloses its digital subscribers' Personal Viewing Information, or any means of opting out of such disclosures of his Personal Viewing Information. Defendant nonetheless knowingly disclosed Plaintiff Clifford's Personal Viewing Information to Facebook.

63. Because Plaintiff Clifford is entitled by law to privacy in his Personal Viewing Information, Defendant's disclosure of his Personal Viewing Information deprived Plaintiff Clifford of the full set of benefits to which he was entitled as part of being a *MLB.com* digital subscriber.

## V. CLASS ACTION ALLEGATIONS

64. Plaintiffs bring this action on behalf of themselves and all others similarly situated as a class action under Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, on behalf of the following class (the "Class"):

> All persons in the United States with a digital subscription to an online website and/or App owned and/or operated by Defendant that had their Personal Viewing Information disclosed to Facebook by Defendant.

Excluded from the Class are Defendant, their past or current officers, directors, affiliates, legal representatives, predecessors, successors, assigns and any entity in which any of them have a controlling interest, as well as all judicial officers assigned to this case as defined in 28 USC § 455(b) and their immediate families.

65. Numerosity. Members of the Class are so numerous and geographically dispersed that joinder of all members of the Class is impracticable. Upon information and belief, hundreds of thousands of members of the Class are widely dispersed throughout the United States. Class members can be readily identified from Defendant's records and non-party Facebook's records.

66. Typicality. Plaintiffs' claims are typical of the claims of members of the Class. Plaintiffs and members of the Class were harmed by the same wrongful conduct by Defendant in that Defendant caused Personal Viewing Information to be disclosed to Facebook without Plaintiffs or Class members obtaining express written consent. Plaintiffs' claims are based on the same legal theories as the claims of other Class members.

67. Adequacy. Plaintiffs will fairly and adequately protect and represent the interests of the members of the Class. Plaintiffs' interests are coincident with, and not antagonistic to, those of the members of the Class. Plaintiffs are represented by counsel with experience in the prosecution of class action litigation generally and in the emerging field of digital privacy litigation specifically.

68. Commonality. Questions of law and fact common to the members of the Class predominate over questions that may affect only individual members of the Class because Defendant has acted on grounds generally applicable to the Class. Such generally applicable conduct is inherent in Defendant's wrongful conduct. Questions of law and fact common to the Classes include:

(a) Whether Defendant knowingly disclosed Class members' Personal Viewing Information to Facebook;

(b) Whether the information disclosed to Facebook concerning Class members' Personal Viewing Information constitutes personally identifiable information under the VPPA;

(c) Whether Defendant's disclosure of Class members' Personal Viewing Information to Facebook was knowing under the VPPA;

(d) Whether Class members consented to Defendant's disclosure of their Personal Viewing Information to Facebook in the manner required by 18 U.S.C. § 2710(b)(2)(B); and

(e) Whether the Class is entitled to damages, punitive damages, reasonable attorneys' fees and other litigation costs reasonably incurred, and other preliminary and equitable relief as the court determines to be appropriate, as a result of Defendant's conduct.

69. Superiority. Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be

pursued individually, substantially outweighs potential difficulties in management of this class action. Plaintiffs know of no special difficulty to be encountered in litigating this action that would preclude its maintenance as a class action.

## VI. CLAIM FOR RELIEF

### FIRST CLAIM FOR RELIEF
**Violation of the Video Privacy Protection Act ("VPPA"), 18 U.S.C. § 2710**

70. Plaintiffs incorporate paragraphs by reference as if fully set forth herein.

71. VPPA prohibits a "video tape service provider" from knowingly disclosing "personally-identifying information" concerning any consumer to a third-party without the "informed, written consent (including through an electronic means using the Internet) of the consumer." 18 U.S.C § 2710.

72. As defined in 18 U.S.C. §2710(a)(4), a "video tape service provider" is "any person, engaged in the business, in or affecting interstate commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audiovisual materials."

73. Defendant is a "video tape service provider" as defined in 18 U.S.C. §2710(a)(4) because it engaged in the business of delivering audiovisual materials that are similar to prerecorded video cassette tapes and those sales affect interstate or foreign commerce.

74. As defined in 18 U.S.C. §2710(a)(3), "personally-identifiable information" is defined to include "information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider."

75. Defendant knowingly caused Personal Viewing Information, including FIDs, concerning Plaintiffs and Class members to be disclosed to Facebook. This information constitutes personally identifiable information under 18 U.S.C. §2710(a)(3) because it identified each Plaintiff and Class member to Facebook as an individual who viewed *MLB.com* or *MLB.tv* Video Media, including the specific prerecorded video materials requested from the website.

76. As defined in 18 U.S.C. §2710(a)(1), a "consumer" means "any renter, purchaser, or subscriber of goods or services from a video tape service provider." As alleged in the preceding paragraphs, Plaintiffs subscribed to a digital *MLB.com* or *MLB.tv* plan that provides Video Media content to the digital subscriber's desktop, tablet, and mobile device. Plaintiffs are thus a "consumer" under this definition.

77. As set forth in 18 U.S.C. §27109(b)(2)(B), "informed, written consent" must be (1) in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer; and (2) at the election of the consumer, is either given at the time the disclosure is sought or given in advance for a set period of time not to exceed two years or until consent is withdrawn by the consumer,

whichever is sooner." Defendant failed to obtain informed, written consent under this definition.

78. In addition, VPPA creates an opt-out right for consumers in 18 U.S.C. § 2710(2)(B)(iii). It requires video tape service providers to also "provide[] an opportunity for the consumer to withdraw on a case-by-case basis or to withdraw from ongoing disclosures, at the consumer's election." Defendant failed to provide an opportunity to opt out as required by VPPA.

79. Defendant knew that these disclosures identified Plaintiffs and Class members to Facebook. Defendant also knew that Plaintiffs' and Class members' Personal Viewing Information was disclosed to Facebook because, *inter alia*, Defendant chose, programmed, and intended for Facebook to receive the video content name, its URL, and, most notably, the digital subscribers' FID.

80. By disclosing Plaintiffs' and the Class's Personal Viewing Information, Defendant violated Plaintiffs' and the Class members' statutorily protected right to privacy in their video-watching habits. *See* 18 U.S.C. § 2710(c).

81. As a result of the above violations, Defendant is liable to the Plaintiffs and other Class members for actual damages related to their loss of privacy in an amount to be determined at trial or alternatively for "liquidated damages not less than $2,500 per plaintiff." Under the statute, Defendant is also liable for reasonable attorney's fees, and other litigation costs, injunctive and declaratory relief, and

punitive damages in an amount to be determined by a jury, but sufficient to prevent the same or similar conduct by the Defendant in the future.

## VII. RELIEF REQUESTED

82. Accordingly, Plaintiffs, on behalf of themselvess and the proposed Class, respectfully requests that this Court:

(a) Determine that this action may be maintained as a class action pursuant to Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, direct that reasonable notice of this action, as provided by Rule 23(c)(2), be given to the Class, and declare Plaintiffs as the representatives of the Class and his counsel as Class Counsel;

(b) Declare that Defendant's conduct as described herein violates the federal VPPA, 18 U.S.C. § 2710(c)(2)(D);

(c) Order Defendant to pay $2,500.00 to each Plaintiff and to each Class member, as provided by the VPPA, 18 U.S.C. § 2710(c)(2)(A);

(d) Order Defendant to pay punitive damages, as warranted, in an amount to be determined at trial, 18 U.S.C. § 2710(c)(2)(B);

(e) Order Defendant to pay prejudgment interest on all amounts awarded;

(f) Order Defendant to pay restitution and all other forms of equitable monetary relief;

(g) Provide for injunctive relief as pleaded or as the Court may deem proper; and

(h) Enter an order awarding Plaintiffs and the Class their reasonable attorneys' fees and expenses and costs of suit, 18 U.S.C. § 2710(c)(2)(C).

## VIII. JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs, on behalf of themselves and the proposed Class, demands a trial by jury on all issues so triable.

Dated: November 21, 2024

Respectfully submitted,

**SHAMIS & GENTILE, P.A.**

*/s/ Andrew J. Shamis*
Andrew J. Shamis, Esq.
New York Bar No. 5195185
ashamis@shamisgentile.com
14 NE 1st Ave., Suite 705
Miami, FL 33132

**EDELSBERG LAW, P.A.**

*/s/ Adam A. Schwartzbaum*
Adam A. Schwartzbaum, Esq.*
Florida Bar No. 93014
adam@edelsberglaw.com
Scott Edelsberg, Esq.*
Florida Bar No. 100537
scott@edelsberglaw.com
20900 NE 30th Avenue
Aventura, FL 33180

**Pro Hac Vice* forthcoming

*Counsel for Plaintiffs and the Proposed Class*

**CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that on November 21, 2024, I caused a true and correct copy of the foregoing to be served on all counsel of record in this action via CM/ECF.

*/s/ Andrew J. Shamis*
Andrew J. Shamis